**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CAMP HILL BOROUGH      :    Civil No. 1:22-CV-01679
REPUBLICAN ASSOCIATION *et al.*,   :
                              :
         Plaintiffs,         :
                              :
         v.                  :
                              :
BOROUGH OF CAMP HILL *et al.*,     :
                              :
         Defendants.       :    Judge Jennifer P. Wilson

## MEMORANDUM

The cross-motions for summary judgment in this case require the court to determine whether certain provisions of the sign ordinance of Borough of Camp Hill violate the First Amendment of the United States Constitution. While these motions raise several issues, the central question is whether the provision of the ordinance that treats "personal expression signs" differently from other "temporary signs" is facially content based and therefore subject to strict scrutiny? The court concludes that it is for the reasons explained herein.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiffs Camp Hill Borough Republican Association ("the Association"), Caroline Machiraju ("Machiraju"), and Katherine Pearson ("Pearson") brought this suit on October 25, 2022, alleging that two provisions of an ordinance adopted by

---

[1] Any additional factual recitation that is necessary for the discussion of each specific issue is included in the Discussion section of this memorandum.

Defendant Borough of Camp Hill ("the Borough") violate the First Amendment of the United States Constitution.  (Doc. 1.)  The amended complaint also names as individual defendants in their official capacity Alissa Packer, the President of the Council of the Borough; Sarah Gibson, Manager of the Borough; and Colton Weichman, Codes Enforcement Officer of the Borough (collectively, "Individual Defendants").  (Doc. 18, ¶¶ 7–9.)  Plaintiffs filed a motion for a temporary restraining order and preliminary injunction.  (Doc. 3.)  Based on a stipulation entered by the parties, the court entered a preliminary injunction on October 27, 2022.  (Doc. 17.)  On November 14, 2022, Plaintiffs filed the operative amended complaint.  (Doc. 18.)  On February 6, 2023, the parties filed cross-motions for summary judgment.  (Docs. 33, 36.)  The motions have been fully briefed, and the court heard oral argument on March 8, 2023.  (Docs. 35, 38, 43, 47, 49, 50.)  Thus, the motions for summary judgment are ripe for resolution.

At issue in this case are certain provisions of Ordinance No. 2021-12 (the "Ordinance"), which the Borough Council adopted and the Mayor of Camp Hill signed into law on December 20, 2021.  (Doc. 1-2, pp. 2–3.)[2]  The contested provisions are part of § 805 "Signs Exempt from the Permit Requirements."  (*Id.* at 10.)  This section instructs that "The following Signs shall be allowed without a Sign permit and shall not be included in the determination of the type, number, or

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

area of permanent Signs allowed within a Zoning District, provided such Signs comply with the regulations in this Part, if any[.]" (*Id.*)  Section 805 regulates address signs, temporary signs, security and warning signs, flags, legal notices, holiday decorations, and directional signs.  (*Id.* at 10–13.)  Section 805(C)(1) states the requirements of temporary signs on residential lots and provides the following:

a.  A property owner may place no more than two (2) Signs, each with a Sign Area no larger than 6 sq. ft., on the property at any time.
b.  A property owner may place one (1) Sign no larger than 2 ft. by 3 ft. in one (1) window on the property at any time.
c.  Signs corresponding to a specific event must be removed within ten (10) days following the conclusion of that event.

(*Id.* at 11.)  Section 805(C)(3) states the requirements for temporary "Personal Expression Signs" ("PES"):

a.  Personal Expression Signs shall have a maximum Sign Area of 10 sq. ft. and a maximum Sign Height of 6 ft. above the ground.
b.  Personal Expression Signs must be non-commercial in nature and must not be illuminated.
c.  Personal Expression Signs shall not be allowed in public parks, public road Rights-of-Way, or on any property where the property owner has not provided permission.
d.  Personal Expression Signs relating to a singular event may be placed sixty (60) days prior to that event and must be removed within thirty (30) days after the conclusion of such event.

(*Id.* at 11–12.)  Section 3 of the Ordinance's preamble provides that its provisions are severable.  (*Id.* at 2.)  As such, should any provision therein be declared invalid or unconstitutional, "such determination shall have no effect on the remaining provisions of this Ordinance."  (*Id.*)

Count I of the amended complaint asserts that § 805(C)(1)(a) (the temporary sign number limitation) is unconstitutional both on its face and as applied to Plaintiff Machiraju.  (Doc. 18, ¶¶ 61–116.)  Count II asserts that § 805(C)(3)(d) (the PES durational limitation for singular events) is unconstitutional because of its durational restriction both on its face and as applied to Plaintiff Pearson.  (*Id.* ¶¶ 117–129.)  Count III asserts that § 805(C)(3)(d) is unconstitutional because it is void for vagueness both on its face and as applied to Plaintiff Pearson.  (*Id.* ¶¶ 130–157.)  Plaintiffs bring these claims, pursuant to 42 U.S.C. § 1983, for alleged violations of the First Amendment and, in the case of Count III, the Fourteenth Amendment.

Plaintiffs seek summary judgment against the Borough arguing that the Ordinance is facially unconstitutional.  In doing so, they argue that § 805(C)(1)(a), which limits the number of temporary signs to two, is content based and fails to pass the relevant standard for constitutionality.  (*See* Doc. 38, pp. 13–31.)  They also argue that § 805(C)(3)(d), which limits the duration of PES relating to a singular event, is unconstitutional on two grounds.  First, they argue that it is content based.  (*See id.* at 23–24.)  Second, they argue it is unconstitutionally vague.  (*Id.* at 31–37.)

Defendants seek summary judgment on all claims.  They argue inter alia that the challenged subsections of the Ordinance are facially constitutional because the

Ordinance is content neutral and § 805(C)(3)(d) is sufficiently specific.  (Doc. 35, pp. 8–26.)  They further argue that Plaintiffs' as-applied claims fail for lack of support, the Association lacks Article III standing, and the claims against the Individual Defendants fail because Plaintiffs have not adequately pleaded or supported a *Monell* claim.[3]  (*Id.* at 26–39.)  For the reasons that follow, the court will grant Plaintiffs Pearson and Machiraju summary judgment on Counts I and II and will dismiss Count III as moot.

## JURISDICTION

Because this case raises a question of federal law under the United States Constitution, the court has original jurisdiction over this case under 28 U.S.C. § 1331.  Venue is appropriate under 28 U.S.C. § 1391.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A

---

[3] Defendants also seek summary judgment for Individual Defendants sued in their individual capacities.  (Doc. 35, p. 31.)  But Plaintiffs' amended complaint and briefs make clear that they are not suing Individual Defendants in their individual capacity.  (Doc. 18, ¶¶ 7–9; Doc. 47, pp. 39–40.)  Therefore, the court will not address that issue.

dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that

there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'"  *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

## A. The Association's Standing.

Article III of the United States Constitution confers judicial powers unto the federal courts.  In doing so, it limits the courts' jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992).  For a legal action to qualify as a case or controversy—for it to fall under a federal court's jurisdiction—a plaintiff must have "standing."

*Cottrell v. Alcon Labs.* 874 F.3d 154, 162 (3d Cir. 2017) (citing *Lujan*, 504 U.S. at 560–61).

There are three requirements for standing: "(1) . . . an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  To meet the first requirement, a plaintiff must show that they suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted).

As Defendants note in their brief, an association plaintiff can have standing either from injuries it directly sustains or from injuries to the members it represents.  (Doc. 35, p. 34 (citing *Pa. Psychiatric Soc'y v. Green Spring Health Serv., Inc.*, 280 F.3d 278, 283 (3d Cir. 2002)).)  Defendants argue that the Association lacks standing on either ground.  They claim that it has suffered no injury-in-fact and represents no members.

## 1.  The Association Cannot Sue on its Own Behalf.

Defendants argue that the Association is wholly unaffected by the Ordinance.  (Doc. 35, p. 35.)  They point out that the challenged provisions of the Ordinance relate solely to PES on residential property.  (*Id.*)  The Association

owns no residential property.  (*Id.*)  Defendants argue that the Ordinance in no way

regulates the Association's activities in handing out signs.  (*Id.*)  Nor does it

prohibit a resident from owning or possessing more than two PES.  (*Id.* at 35–36.)

Defendants argue that the situation here is akin to *Service Employees International*

*Union, Local 3 v. Municipality of Mount Lebanon*, 446 F.3d 419 (3d Cir. 2006)

("*SEIU*"), in which the union challenged a local ordinance that regulated

canvassing and soliciting.  (Doc. 35, pp 34–35; 446 F.3d at 421.)  The court in

*SEIU* concluded that the union, because it did not intend to solicit, was unaffected

by the portion of the ordinance pertaining to solicitation.  446 F.3d at 422–25.  As

a result, it lacked an injury-in-fact and therefore had no standing to challenge the

solicitation portion of the ordinance.  *Id.*

The Association counters that handing out signs for residential use is one of

the ways it achieves its objective of supporting candidates for office.  (Tr., p. 66.)[4]

The Association asserts that the present situation is like *Havens Realty Corp. v.*

*Coleman*, 455 U.S. 363, 372–379 (1982).  (Doc. 47, p. 36.)  In *Havens*, the

Supreme Court held that a Virginia nonprofit had standing.  The nonprofit had the

purpose of making equal opportunity housing a reality in its geographic area.  455

U.S. at 368.  To that end, it provided housing counseling services and investigated

---

[4] Due to the expedited nature of this proceeding, the court cites to the draft transcript from the
March 8, 2023, hearing.

referred complaints of housing discrimination.  *Id.*  The organization alleged that the petitioners, owners and operators of apartment complexes which had employed racially discriminatory renting practices, frustrated the organization's counseling and referral services.  *Id.* at 369.  It alleged that the petitioners' conduct had drained the organization's resources.  *Id.*  The Court concluded that petitioners' conduct had perceptibly impaired the organization's services and, as a result, drained the organization's resources.  *Id.* at 379.  The Court, therefore, agreed with the Court of Appeals and concluded that the District Court had improperly dismissed the organization's claims for lack of standing in its own right.  *Id.*

At oral argument, Plaintiffs conceded that there is nothing in the Ordinance that directly limits or regulates the dissemination of yard signs.  They likewise conceded that the Ordinance would not impair a resident from rotating their signs in order to support more candidates while still complying with the Ordinance. Residents could also tape signs back-to-back in order to effectively advertise two candidates for every PES on their premises.

The Association's assertion of an injury-in-fact rests on the asserted belief that the Ordinance reduced resident demand for the Association's yard signs.  To support this assertion, they noted that in the 2020 election cycle, the Association was not able to hand out as many signs as Mr. Lewis, the Association's

chairperson, had anticipated they would—they had leftover signs.  (Tr., p. 72; *see* Doc. 34-24, p. 54.)

Even assuming the reduction in actual signs disseminated relative to the expected volume constitutes a valid injury-in-fact, Defendants point out the paucity of evidence the Association has presented to suggest that the Ordinance *caused* the reduction.  During deposition testimony, Mr. Lewis only identified a single person who, he believed, declined a sign based on the Ordinance.  (Tr., p. 73.)  In Mr. Lewis' testimony, he asserted that multiple people told him they did not want signs because they did not want to be fined.  (Doc. 34-24, p. 124.)  But Mr. Lewis recalls only one resident by name who, he believed, declined a sign for this reason.  (*Id.* at 120.)

Unfortunately for Plaintiffs' argument, Mr. Lewis' testimony makes clear that the single resident he identified was already in violation of the Ordinance and apparently unconcerned about consequences related to the prohibited conduct. More importantly, the resident never actually told Mr. Lewis that they no longer wanted more signs—instead, the person failed to answer the door and answer Mr. Lewis' phone calls to the point where he gave up.  (*Id.* at 123.)  Thus, the only evidence linking the Ordinance to the resident's reticence to take more signs—or, more accurately, to fail to respond to Mr. Lewis—is Mr. Lewis' subjective belief, which is unsupported by facts.  Also, more generally, the Association conceded

11

that other factors may have impacted their ability to find willing sign recipients, such as the number of positions up for election, increased political polarization in the Borough, and growing hostility between neighbors.  (Tr., p.71; Doc. 34-24, pp. 121–22.)

The court concludes that the Association has failed to show that it has suffered an injury-in-fact on its own behalf.  The Ordinance does not regulate the Association's ability to hand out signs.  Unlike the organization in *Havens*, the Association has not alleged that the Ordinance has drained its resources.  Instead, its only alleged injury is that it failed to hand out as many signs as Mr. Lewis anticipated.  But there is no evidence to support Mr. Lewis' prediction, nor is there any reason to believe that he has any particular expertise qualifying him to make an accurate prediction of the number of signs to be distributed.

If, for the sake of argument, the Association has suffered an injury-in-fact, there is also insufficient evidence to suggest that it has been caused by the challenged provisions of the Ordinance.  As noted above, Mr. Lewis did not provide the name of a single person who declined to take a sign on account of the Ordinance.  And, as for the one person he did name, the evidence suggests that this person was not concerned about violating the Ordinance.  Mr. Lewis' opinion to the contrary, that the resident stopped answering the door or returning his calls for fear of violating the Ordinance, not only lacks any factual basis but is also mere

speculation.  As a result, the Association has not shown that, if it has suffered an injury-in-fact, that injury is fairly traceable to the Ordinance.  Because it lacks Article III standing, the Association cannot bring claims on its own behalf.

### 2.  The Association Cannot Sue on Behalf of its Members.

Defendants argue that, in addition to lacking standing to sue on its own behalf, the Association lacks associational standing to sue on behalf of its members.  (Doc. 35, p. 36.)  An association has such standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

In assessing an association's so-called "associational standing" to sue on behalf of its members, a court looks to see whether its purported members possess a traditional form of membership.  *See Hunt*, 432 U.S. at 344.  If they do not, the court looks to see if members possess "indicia of membership."  *See id.*  In *Hunt*, the Supreme Court found it notable that although members of the appellee's commission lacked traditional trade association membership they possessed "all the indicia of membership in an organization."  *Id.*  Specifically, they had sole power to elect the commission's members, they were the only people eligible to

serve on the commission, and they alone financed the commission's activities, including the underlying lawsuit, through assessments which the commission levied upon members.  *Id.*

Defendants argue that the Association lacks all such indicia.  Instead, the Association functions as an email list.  Its purported membership lists are largely inconsistent, and it lacks any requirements as to its members' residence or party affiliation.  (Doc. 35, p. 37.)  The Association does not follow its bylaws or demonstrate any formality, and its members pay no fees.  (*Id.* at 37–38.)  Even the present lawsuit was filed in violation of the Association's own bylaws for decision-making.  (*Id.*)

To illustrate, besides being a party to this suit, Plaintiff Machiraju, as an elected committeeperson, is, according to the Association, an Association member. (Doc. 47, p. 37.)  Plaintiff Machiraju also believes herself to be in one of the Association's leadership positions.  (Doc. 35, p. 38.)  But Defendants note that Plaintiff Machiraju testified that she was unaware that a vote was ever taken to decide whether the Association would bring the present suit.  (*Id.*)  Nor were there any minutes taken of the Zoom meeting in which the Association voted to bring this action.  (*Id.*; Doc. 34-24, p. 148.)

While the Association argues that it represents members, it provides no evidence of traditional membership or, in the alternative, indicia of membership.

At best, Mr. Lewis makes the unsupported assertion that the Association's Members are elected committee people.[5]  (Doc. 47, pp 37–38.)

No facts suggest that the Association has either a traditional membership or, in the absence thereof, indicia of membership.  There is no evidence to support Mr. Lewis' assertion that the Association's membership is comprised of elected committee people.  Even if this assertion were true, these Members do not support the Association monetarily, they did not finance this lawsuit, and the evidence strongly suggests that the Association follows none of the formalities of its own bylaws—bylaws which presumably would, in part, define and protect the rights of members.

For the reasons stated above, the Association lacks standing to sue on its own behalf or as a representative of its purported members.  Therefore, the court will grant Defendants judgment, which they are entitled to as a matter of law, with respect to the Association's claims against them.

### B. Facial Challenges to the Ordinance.

Defendants do not dispute that Plaintiffs Pearson and Machiraju have standing.  Therefore, the court will next address the motions for summary judgment as to the claims made by these individual plaintiffs.

---

[5] The Parties' arguments distinguish between the Association's "members" and "Members." This memorandum omits this issue, but the arguments are assessed in the light most favorable to the Association, which is the non-movant with respect to the issue of organizational standing.

The First Amendment of the United States Constitution instructs that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Free Speech Clause "applies to the states through the Due Process Clause of the Fourteenth Amendment." *Borden v. Sch. Dist. of Twp. of East Brunswick*, 523 F.3d 153, 168 (3d Cir. 2008). As such, it also applies to municipal regulations of yard signs. *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994).

When assessing whether a municipal ordinance unconstitutionally limits free speech, not all regulations are measured by the same yardstick. Regulations that are content based are reviewed under the "onerous standard of strict scrutiny," while content-neutral regulations are subject to the "less stringent standard of intermediate scrutiny." *City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 142 S. Ct. 1464, 1471–71, 1475 (2022).

Speech regulations subject to strict scrutiny are presumptively unconstitutional and "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 155 (2015). By contrast, under intermediate scrutiny, the government is afforded some deference. *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016). To survive intermediate scrutiny, the government must show that a restriction of speech is "narrowly tailored to serve a significant government

interest."  *City of Austin*, 142 S. Ct. at 1475 (citation omitted); *see Bruni*, 824 F.3d at 370.

The United States Supreme Court has held that an ordinance is facially content based where it sets apart "Political Signs" as a distinct category treated differently than "Ideological Signs" and various other categories.  *Reed*, 576 U.S. at 164.  More generally, the Court in *Reed* concluded that such facial distinctions, "defining regulated speech by particular subject matter," and even others which act more subtly to regulate speech by "function or purpose" are "distinctions drawn based on the message a speaker conveys" and therefore are subject to strict scrutiny.  *Id.* at 163–64.  Later, in *City of Austin*, the Court addressed this issue further.[6]

### 1.  Section 805(C)(3) is Unconstitutional.

#### i.  The Durational Limit Imposed by § 805(C)(3)(d) is Content Based and Strict Scrutiny Applies.

Plaintiffs challenge the Ordinance, in part, because it has different durational limits on PES related to a singular event, § 805(C)(3)(d), when compared to other temporary signs.  (*See* Doc. 38, p. 24 (arguing that election signs have different durational limits than non-election ideological signs).)   Plaintiffs argue that the

---

[6] Justice Thomas, who authored the majority opinion in *Reed*, opined that the majority in *City of Austin* weakened the *Reed* rule.  *See City of Austin*, 142 S. Ct. at 1484 (Thomas, J., dissenting) (arguing that the majority opinion implicitly rewrote *Reed's* bright-line rule with a more lax one).

Ordinance is content based because "the Borough must read the signs to determine in which category they belong, and thus which regulation applies." (*Id.* at 14.)

The Borough argues that its ordinance is content neutral.  It argues that the "read-the-sign" rule that Plaintiffs propose is "an oversimplification" and one that the Supreme Court has called "too extreme an interpretation of this Court's precedent." (Doc. 43, p. 8 (quoting *City of Austin*, 142 S. Ct. at 1471).)  It also points out that the Third Circuit has upheld regulations which would fail Plaintiffs proposed rule.  (*Id.* (citing *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 149 (3d Cir. 2022)).)  The Borough asserts that, unlike in *Reed*, the Ordinance treats all PES similarly regardless of whether their content is political, ideological, or otherwise. Unlike in *Reed*, the Ordinance does not distinguish between political and ideological speech.  (Doc. 35 p. 12.)  Instead, the Ordinance treats all PES similarly regardless of their specific content.  (*See id.*)  And while PES related to a singular event have different durational requirements than non-PES event signs, the former would apply to an election just as it would a non-political rally, a school event, a Kiwanis club meeting, or any other PES-related event.

The Borough argues that the present instance is like *City of Austin* and *Mazo*.  These cases stand for the principle that "speech regulations remain content neutral if the regulation's 'examination of speech is only in the service of drawing neutral lines.'" (Doc. 43, p. 10 (quoting *Mazo*, 54 F.4th at 149).)  The Court in

*City of Austin* concluded that an ordinance which distinguished between signs based on whether they referenced on- or off-premises events only required examination of a sign's speech to draw such neutral lines.  142 S. Ct. at 1471–72. It concluded the ordinance was content neutral and subject to intermediate scrutiny.  *Id.*  The Third Circuit in *Mazo* came to a similar conclusion.  In *Mazo*, state law required written consent were a political candidate to use the name of another person or association in their own slogan on the primary ballot.  54 F.4th at 147–52.  The Borough argues that, as in *City of Austin* and *Mazo*, analyzing the content of a sign to see whether it falls under § 805(C)(3)(d) is only necessary "in the service of drawing neutral lines and is not concerned with the actual communicative content. (Doc. 43, p. 11.)  Rather, the Borough asserts that § 805(C)(3)(d) is a "time, place, and manner regulation."  (*Id.* (internal quotation marks omitted) (citation omitted).)

The Borough also argues that it underwent an extensive process to ensure that the Ordinance was content neutral.  (*Id.* at 12–13.)  It notes that even the Ordinance itself sets out its "Purposes and Intent."  Section 802(C) states that these purposes include "[e]stablishing reasonable time, place, and manner regulations without regulating content."  (Doc. 1-2, p. 5.)

While precedent provides the court with guidance, no controlling precedent is directly on point.  The court finds that, although not identical, the sign ordinance

provision at issue here is most like that in *Reed*.  By distinguishing PES, which includes both ideological and political expression signs, from other temporary signs, § 805(C)(3) creates a content-based category.  Then, § 805(C)(3)(d) sets a different durational limit for the category of PES related to singular events.  As a result, the Ordinance is content based and subject to strict scrutiny.

As was the case in *Reed*, the Ordinance provides different treatment for various categories of signs.  In *Reed*, the Court described the first category as "Ideological," the second as "Political," and the third as "Temporary Directional Signs Relating to a Qualifying Event."  576 U.S. at 159–60.  The last category, which was treated less favorably than Ideological or Political signs, included signs related to church and nonprofit gatherings.  *Id.* at 159–61.  The Court observed that Temporary Directional Signs were defined by whether they conveyed a message directing the public to church or some other Qualifying Event.  *Id.* at 164.  Political and Ideological signs were similarly defined by the content of the message they conveyed.  For this reason, the Court concluded that the town's code was content based on its face.  *Id.*

Here, too, the Ordinance treats signs differently based on the messages they convey.  For example, the Ordinance defines PES as "An On-Premises Sign that expresses an opinion, interest, position, or other non-commercial message."  (Doc. 1-2, p. 8.)  This definition applies equally to signs whether their subject matter is

religious, social, economic, or political.  It applies to proclamations of faith and

expressions in support of, or attacks on, local unions.  More concretely, it would

apply to signs proclaiming "Black Lives Matter" or "Blue Lives Matter."  All these

signs fall under § 805(C)(3).  As a result, they are subject to the durational

requirement for temporary signs, which provides that they "can be displayed for no

more than thirty (30) consecutive days at a time, unless stated otherwise herein."

(*Id.* at 9.)  In other words, these signs can be displayed for an infinite duration, as

long as they are removed for one day every thirty days.  On the other hand, a sign

promoting "Candidate X for Office in 2024" is a PES relating to a singular event.

As such, it is subject to the durational provision of § 805(C)(3)(d).[7]  The election

sign may be placed no earlier than 60 days prior to the election and must be

removed within 30 days after the election.  In short, PES related to a singular event

have a different durational limit than PES not related to a singular event.[8]

---

[7] As Defendants point out, § 805(C)(3)(d) is not limited to political yard signs.  But the example shows how the Ordinance categorizes signs, based on content, for disparate treatment within § 805(C)(3).

[8] This distinction between PES unrelated to a singular event and PES related to a singular event might on its own be content neutral.  There is reason to believe that durational limits for signs related to events are content neutral. Justice Alito, in his concurrence in *Reed*, provided a non-comprehensive list of municipal sign restrictions that would not be content based.  576 U.S. at 174–75 (Alito, J., concurring).  In it, he included "Rules imposing time restrictions on signs advertising a one-time event."  *Id.* at 175.  He reasoned that "Rules of this nature do not discriminate based on topic or subject and are akin to rules restricting the times within which oral speech or music is allowed."  *Id.*  But this reasoning does not render content neutral the disparate treatment of event signs that are related to PES from those which are not.

There is a similar contrast between the limitations for non-PES event signs and PES event signs. The former, though nowhere explicitly defined in the Ordinance, are addressed by § 805(C)(1)(c). Such signs, presumably subject to the same 30-day limitation applicable to all temporary signs, must be removed within ten days of the event's conclusion. (*Id.* at 11.) Thus, non-PES event signs can be displayed as far in advance of the event as desired (as long as they are removed for one day every thirty days), but they must be removed in one-third the time that PES event signs must be removed. The Ordinance divides event signs on residential lots by whether their content relates to personal expression or not. Based on that distinction, the signs are regulated differently. The court concludes that this differential regulation based on content is sufficiently similar to the sign code at issue in *Reed* to conclude that Section 805(C)(3)(d) is content based.

In drafting the Ordinance, the Borough contends, and the evidence suggests, that the Borough was acting in good faith to comply with Supreme Court precedent. It seems most likely that the Borough intended to establish reasonable time, place, and manner regulations without regulating content. To do so, the Borough made efforts to avoid that which the court in *Reed* explicitly prohibited— separating out political and ideological signs for disparate treatment. But broadening the category to include both political and ideological in one category

called PES does not avoid the underlying problem of differentiating between categories of speech.

Moreover, the Borough's purpose and intent in drafting the Ordinance does not make the Ordinance content neutral.  When a regulation is facially content based, binding precedent instructs that the purpose and intent of the regulation are irrelevant.  *Reed*, 576 U.S. at 165 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech.").  As a result, the court will analyze § 805(C)(3)(d) under strict scrutiny.

### ii.  Section 805(C)(3)(d) Cannot Pass Strict Scrutiny.

Subject to strict scrutiny, § 805(C)(3)(d) is presumptively unconstitutional unless the Borough can meet its burden of showing it is "narrowly tailored" to achieve a "compelling [government] interest."  *Reed*, 576 U.S. at 155, 171 (citation omitted).  Defendants assert that the Ordinance serves the governmental interests of traffic safety and aesthetics.  (Doc. 35, p. 15.)   And they point out that the Third Circuit and Supreme Court have found these to be "substantial governmental goals."  (*Id.* (citing *Riel v. City of Bradford*, 485 F.3d 736, 752 (3d Cir. 2007); *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984)).)

But Defendants concede that no Supreme Court or U.S. Court of Appeals precedent has held that traffic safety and aesthetics qualify as compelling government interests.  They point out, however, that neither have higher federal courts conclusively held that traffic safety and aesthetics are *not* compelling government interests.  Defendants also argue that the court in *Reed* implied that an ordinance narrowly tailored to traffic safety might pass strict scrutiny.  The court concludes that the Borough has not met its burden in showing a compelling government interest.  Therefore, § 805(C)(3)(d) cannot pass strict scrutiny and is unconstitutional.

Although Plaintiffs' attack on § 805(C)(3) focuses on the durational limitation of § 805(C)(3)(d), the court observes there are other aspects of the subsection which are content based and fail strict scrutiny.  Sections § 805(C)(3)(a), (C)(3)(b), and (C)(3)(c) of the Ordinance impose sign size limitations, lighting limitations, and a blanket prohibition of PES from public parks and public property, inter alia.  Applying the same analysis to these regulations of PES, as opposed to other temporary signs, the court finds that singling out PES for this differential treatment is not narrowly tailored to the Borough's interests in traffic safety and aesthetics.  The court concludes that § 805(C)(3) unconstitutionally violates the First Amendment.  As a result, the court will strike it down.  As noted above, the provisions of the Ordinance are severable.

Therefore, the remaining provisions of the Ordinance remain in effect without § 805(C)(3).[9]

### 2. The Number Limitation Provision of the Ordinance is Content Based.

The court's next task is to determine whether the other challenged provision of the Ordinance, the two-sign limit provided in § 805(C)(1)(a), is unconstitutional. At oral argument, Plaintiffs' counsel conceded that, should the PES provision of the Ordinance be removed, the provision setting a two-sign limit for all temporary signs would be content neutral.  (Tr., p. 10.)  That is effectively the case at this juncture, because the court is striking down § 805(C)(3).  But the court cannot accept Plaintiffs' concession for the following reason.

When viewed in isolation, the two-sign limit of § 805(C)(1)(a) appears to be content neutral because it applies to all temporary signs.  But, when determining whether a provision is content neutral, the court may look beyond the challenged portions of the regulation.  As noted above, in *Reed*, the challenged portion of the sign code related to limitations on Temporary Directional Signs Relating to a Qualifying Event.  The Court in *Reed* did not view this provision in isolation. Instead, it compared the treatment of such signs to Political and Ideological signs.

---

[9] Plaintiffs also challenge § 805(C)(3)(d) by alleging it is unconstitutionally vague.  (Doc. 50, pp. 21–23.)  Because the court has already concluded that this provision violates the First Amendment, it will not address Plaintiffs' vagueness arguments.

Here, all Temporary Signs on Residential Lots are subject to a two-sign limit.  But there are no similar numerical limits for other types of signage, which are defined by the content of the message conveyed.  Specifically, Security and Warning Signs, Holiday Decorations, and Directional Signs on residential properties have no number limits.  The court concludes that, by providing a two-sign limit for some signs, but not others, based on the messages they convey, § 805(C)(1)(a) is content based and subject to strict scrutiny.

As with the durational limitation, it is the Borough' burden to show a compelling government interest.  Because they have not convincingly argued that traffic safety and aesthetics are a compelling government interest, § 805(C)(1)(a) fails strict scrutiny.  Section 805(C)(1)(a) unconstitutionally violates the First Amendment.

### C. Individual Defendants are Entitled to Summary Judgment.

#### 1.  The Court will Grant Summary Judgment to Individual Defendants Because the Claims Against Them are Redundant.

In moving for summary judgment on the claims against Individual Defendants, Defendants posit that "[t]here is no legal difference between Section 1983 claims against the Borough and Section 1983 official capacity claims against Defendants Packer, Gibson, and Weichman."  (Doc. 49, p. 21.)  Therefore, they argue, the court *must* grant summary judgment for Individual Defendants.  (Doc. 35, pp. 30–31.)  Relying on *Brandon v. Holt*, 469 U.S. 464, 461–72 (1985), they

argue that the claims brought against Individual Defendants are "entirely duplicative of any claims against the Borough." (Doc. 49, p. 21.) They note that in the Third Circuit, a district court has the power to dismiss redundant official capacity claims. (*Id.* at 22 (citing *Cuvo v. De Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006)).)

At oral argument, Plaintiffs conceded that it is within the court's discretion as to whether these claims are dismissed as redundant, and Defendants agreed.[10] Given the type of relief Plaintiffs are seeking, which is limited to injunctive relief and attorneys' fees, they concede that it makes no difference as to whether Individual Defendants are included henceforth. (Tr., p. 77.)

Plaintiffs are correct in stating that it is up to the court's discretion whether to grant Individual Defendants' summary judgment because the claims against them are redundant. The claims against them are duplicative and serve no apparent purpose in this litigation. Therefore, the court will exercise its discretion and grant Individual Defendants summary judgment.

---

[10] This marks a departure from Defendants' initial brief in which they argued that the court *must* grant summary judgment due to redundancy. (Doc. 35, pp. 30–31.)

**2. Plaintiffs, as Non-Movants, Have Failed to Make a Showing Sufficient to Survive Summary Judgment for their Claims Against Individual Defendants.**

In the event the Third Circuit disagrees with the court and holds that § 805(C)(3) is facially valid, then Plaintiffs' claims against Individual Defendants may not be redundant. But Individual Defendants are still entitled to summary judgment. Individual Defendants have argued that they are entitled to summary judgment because Plaintiffs have failed to support their as-applied claims, which are subject to a *Monell* framework. (Doc. 35, p. 26–27 (citing *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 694 (1978); *Porter v. City of Phila.*, 975 F.3d 374, 391 (3d Cir. 2020)).) Defendants point out that Plaintiffs' claims against Individual Defendants in their official capacity are "the same as the claims raised against the [Borough]." (*Id.* at 30 (citing *Brandon*, 469 at 471–472).) And as-applied claims against the Borough would be subject to *Monell*. (*Id.* at 27 (citing *Porter*, 975 F.3d at 391.) Therefore, Defendants argue that, by failing to assert or support a *Monell* claim, Plaintiffs lack any valid theory of liability against Individual Defendants, as distinct from liability against the Borough. (Tr., p. 83.)

In response, Plaintiffs fail to assert facts to support the required elements of a *Monell* claim. Their briefing incorrectly argues that *Monell* does not apply.[11]

---

[11] At oral argument, Plaintiffs' counsel explained that this statement was a mistake due, in part, to the word limit imposed on briefing. (Tr., p. 84.) The court notes that, while it did impose a limit of 8,000 words per brief, this was more than the standard 5,000 words provided by the local

(Doc. 47, p. 33.)  At oral argument, Plaintiffs' counsel switched course.  They agreed that *Monell* applies and stated that they are bringing *Monell* claims against Individual Defendants.  (Tr., p. 84.)  But Plaintiffs' counsel still failed to support any such claim.  The court asked whether Plaintiffs had a *Monell* claim, and where it is found in the pleadings.  (*Id.*)  Counsel responded that, "at this point, maybe" we can raise a *Monell* claim.  "[W]e don't know, but we're certainly not waiving the claim for all time."  (*Id.* at 84–85.)

Unfortunately for Plaintiffs, a non-moving plaintiff cannot defeat summary judgment by stating that they are "not waiving" a claim.  When given the opportunity, through briefing and oral argument, they failed to articulate any factual support for their *Monell* claims.  Therefore, the court concludes that Individual Defendants are entitled to summary judgment for this additional reason.

---

rules.  (Doc. 32, p. 1; Local Rule 7.8(b).  Rather than presenting a short and incorrect argument, counsel could and should have requested leave of the court to submit a longer brief.

Case 1:22-cv-01679-JPW   Document 52   Filed 03/29/23   Page 30 of 30

## CONCLUSION

For the reasons provided herein, the court will grant summary judgment to Plaintiffs Pearson and Machiraju on Counts I and II and will dismiss Count III as moot.  An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: March 29, 2023

30